# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TIMOTHY J. COLEMAN,** | : | No. 3:06cv1566 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| **PTG LOGISTICS,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is defendant's motion for summary judgment (Doc. 17) in this disability discrimination case. Having been fully briefed and argued, the case is ripe for disposition.

**Background**

Plaintiff worked as a delivery driver for Defendant PTG logistics from September 2000 until May 2001, when he was fired. (Defendant's Statement of Undisputed Material Facts (Doc. 17-2) (hereinafter "Defendant's Statement") at ¶ 4).[1] Plaintiff operated out of Defendant's Kirkwood, NY facility. He was one of five drivers there. (Id. at ¶ 5).

While working at Kirkwood, defendant's main delivery customer was a company called Door Fabrication. (Id. at ¶ 6). Plaintiff's main responsibility while

---

[1] Defendant filed a statement of undisputed material facts and plaintiff filed a response to that statement. The court will cite to the defendant's statement for facts which are not disputed. If there is a dispute as to the facts, the court will note that.

working at PTG was to deliver doors manufactured by Door Fabrication to home improvement stores like Home Depot or Lowe's in New York and Pennsylvania. (Id. at ¶¶ 7-8). Plaintiff also testified that he occasionally delivered trailers for drop-off to Maryland. (Plaintiff's Counterstatement of Material Facts (Doc. 26-2) (hereinafter Plaintiff's Statement) at ¶ 7). Plaintiff was not required to do any loading or unloading for these deliveries. (Id.).

Part of plaintiff's job was to install load straps on his truck's freight trailer to ensure that the load remained in a particular area of the truck. (Defendant's Statement at ¶ 9). After every delivery, plaintiff would have to re-insert load straps, pulling them to secure the load and prevent it from sliding around on the trailer. (Id. at ¶ 10). Plaintiff also had to unload the trailer himself at some delivery points. (Id. at ¶ 11). Plaintiff did this unloading while employed at PTG, and testified that he had to do this as part of his job at PTG. (Id. at ¶ 13). Plaintiff denies that these requirements were arduous, or that he actually had to unload trailers at delivery sites. (Plaintiff's Statement at ¶¶ 9-12).

Five or six weeks into his employment at PTG, the company began requiring drivers to move freight around in their trailers to accommodate new loads. (Defendant's Statement at ¶ 16). Plaintiff contends that these requirements were not arduous, that he rarely had to lift even ten pounds and that such work consisted largely of "sliding" a cargo pallet so a forklift could pick it up. (Plaintiff's Statement at ¶ 14, 16).

2

Plaintiff injured himself during his employment with defendant. (Defendant's Statement at ¶ 17). He harmed his knee while unloading a truck. (Id.). Plaintiff insists that he was not unloading the truck himself, but simply "sliding" cargo along when he slipped on plastic in the trailer. (Plaintiff's statement at ¶ 17). His toe was caught underneath a cargo pallet and his knee "popped" while his leg slid. (Id.). This injury set in motion the events that led to plaintiff's original lawsuit against PTG Logistics. (Defendant's Statement at ¶ 31). PTG fired plaintiff after his injury, and plaintiff sued, contending that his discharge was wrongful under Pennsylvania law. (Id.). Plaintiff alleged that he had been terminated in retaliation for filing a workers' compensation claim. (Id.). The parties eventually settled the case. (Id. at ¶ 32). The settlement agreement contained a clause that required PTG to hire Coleman as a CDL Class A driver in Kirkwood, New York beginning on March 8, 2004. (Id. at ¶ 33). Plaintiff was required to report to the PTG office two weeks before that date to be screened for his reemployment. (Id.). The agreement specified that "employment is contingent upon [plaintiff] passing all PTG driver requirements and all pre-employment screens in accordance with the Department of Transportation, including but not limited to a pre-employment drug screen and Department of Transportation physical." (Id.).

Plaintiff returned to PTG on March 4, 2004, seeking reemployment pursuant to this agreement. (Id. at ¶ 35). At that meeting, plaintiff received a description of the physical requirements for the job he sought. (Id. at ¶ 36). PTG established specific

3

physical requirements for a driver holding plaintiff's job (CDL-A driver). (Id. at ¶ 22). He had to "be able to bend, twist, stretch, climb, and squat as necessary. Must be able to handle customer load requirements. Must be able to lift 75 lbs. Must be able to pull a pallet jack, crank dollies, hook & unhook trailer." (Job Description (Doc. 17-5) at 1). This 75-pound lifting requirement was necessary because PTG's customers expect drivers to be able to help unload the freight and because the Federal Department of Transportation requires drivers to re-examine cargo during deliver and prevent cargo from shifting or falling off the vehicle. (Defendant's Statement at ¶ 22).

Another physical requirement of the job is the ability to pull a pallet jack. (Id. at ¶ 23). Drivers must also be able to crank a dolly and hook and unhook a trailer from the tractor. (Id. at ¶ 24). Defendant insists that all drivers must also be able to lift 75 lbs; the requirements of the job for moving freight make this skill essential. (Id. at ¶ 27). Plaintiff argues that defendant had several jobs available which did not require any lifting and that the seventy-five pound lifting requirement had been added to the job to prevent plaintiff from being rehired. (Plaintiff's Statement at ¶ 25). Defendant contends that hiring an assistant for a driver who could perform these lifting jobs would be cost-prohibitive. (Id. at ¶ 28). Plaintiff disputes this contention, arguing that in his experience driving for other companies customers willingly pay for such an assistant. (Plaintiff's statement at ¶ 28).

On March 1, 2004, Dr. Kyung I. Kim signed a note that allowed plaintiff to

return to light duty work, but prohibited him from lifting, pushing or pulling. (Exh. 5 to Plaintiff's Statement (Doc. 28-9)). The form also included as a remark the "Talladega Series wide [?] rear 9052/905-1910." (Id.). The note does not explain the meaning of that remark. (Id.). On March 4, 2004, plaintiff went to defendant's Kirkwood, NY facility to fill out an employment application. (Id. at ¶ 35). He looked over the job description for a CDL driver position. (Id. at ¶ 36). He informed one of defendant's employees, Jerry Beech, that he could handle all of the physical requirements of the job, except for the 75-pound lifting requirement. (Id. at ¶ 37). He cited the limitations on lifting stated by Dr. Kim. (Id. at ¶ 37). According to plaintiff he also told Beech that he could not sit for long periods because of an injury to his hip which was exacerbated by his knee injury. (Plaintiff's Statement at ¶ 37). He could work, however, if allowed to use a Talledega seat and allowed to make runs that did not require him to unload the trailer. (Id.).

Plaintiff includes an exhibit to his brief that contains medical records. One of those records is from Dr. Kim, based on an examination performed on 2/26/04. (See Exh. 4 to Plaintiff's Statement). In his report of that examination, Dr. Kim diagnoses plaintiff with "degenerative osteoarthritis left hip along with early degenerative arthritis both knee joints. Open reduction internal fixation requiring a special chair driving the truck. Denies any radiating pain, but also pain in both knee joints especially the medial side. History of arthroscope procedure both knees in the past.." (Id.). He notes that "I think patient has been driving truck using a special

chair that has helped to alleviate the pain in the hip area and back area. Patient I don't think is able to do heavy lifting, pushing, pulling. I think as long as the patient is using the special chair presently the patient is using Tetalladaga [sic] series wide ride, 9052/905-1910. No lifting, pushing and pulling." (Id.).

Dr. Kim performed another examination on June 25, 2004. (See Id.). He noted that plaintiff had found another job and was able to perform his new truck-driving job with a special chair. (Id.). Plaintiff had occasionally been lifting up to fifty pounds, and Dr. Kim recommended that "he can try to go back to work and lift up to 50 lbs." (Id.). On March 18, 2004, Dr. Kim issued another report, this time restricting plaintiff to lifting 20 pounds or less. (Id.). A return to work form prepared by Dr. Kim on 6/25/04 cleared plaintiff to return to work, but imposed a restriction of "no lifting pushing pulling over 50 lbs." (Id.).

When plaintiff sought to return to work he discussed his limitations with Jerry Beech. According to plaintiff's deposition, plaintiff told Beech about his restrictions on lifting but insisted he could drive eight hours a day if given the "accommodation" of a special seat. Plaintiff brought a copy of the manual for that seat to his interview with Beech, who made a copy for the company. He agreed, however, that the seat would not solve his problems with lifting or pulling. Plaintiff also testified that his hip and knee problems limited his ability to walk up and down the 53-foot length of a trailer.

PTG then informed plaintiff that it would not hire him as a driver because he

6

could not meet the physical requirements for the job.  PTG's counsel sent plaintiff's counsel a letter informing him of the reasons for this decision.  Counsel concluded that the requirements of lifting, bending, twisting, stretching, climbing and squatting in the job description precluded plaintiff from doing the job.  Department of Transportation also require drivers periodically to examine cargo on the truck and adjust the load securing devices.  Defendant's counsel determined that plaintiff's lifting requirements prevented him from performing the job.  Because plaintiff could not perform the job requirements, PTG logistics was not obligated to hire him.

PTG contends that it did not consider the lifting requirement to be a disability as defined by the Americans with Disabilities Act (ADA), and insists that plaintiff did not request an accommodation for his inability to lift more than twenty pounds. Plaintiff also did not request another position with the company that would better fit his physical abilities.

PTG also contends that it could not assign plaintiff to a particular truck as an accommodation.  PTG does not own trucks, but leases ten trucks for the Kirkwood facility.  No driver at the facility uses the same truck every day.  Defendant contends that the high turnover rate and the small number of trucks available (10 trucks for 20 drivers) means that assigning a particular truck to one driver would not be feasible. Installing a special chair in a truck would also be impossible, since more than one driver uses every truck and doing so may violate the terms of leasing for the truck. In any case, defendant contends, a special seat would not solve the problem that

7

plaintiff is incapable of meeting the lifting requirements for the job.

Plaintiff found a job after being refused employment with defendant. He obtained a job as a driver with MCT Transportation. At that company, he was required to lift fifty pounds and assist in the loading and unloading of trailers. Plaintiff produced a note from Dr. Kim that allowed him to meet this requirement, and plaintiff was hired. Plaintiff did not contend to MCT that he could not meet this requirement.

In April 2006 plaintiff began to work for Kane Transportation. Kane hired plaintiff as a healthy driver and received a full release for work from Dr. Cognetti. This "full release" meant that plaintiff could perform any of the functions of the job, including unloading the trailer. Plaintiff works for Kane without any restrictions, and he never asked for any. At his job, he has performed much of the manual labor from which he was formerly restricted, including pulling a pallet with a jack from one end of a trailer to another and breaking down freight in a trailer, which required lifting. He got a new seat in his truck, but only because the old seat was worn. Kane allows its drivers to seek assistance for unloading a truck. The driver must call a dispatcher, who then determines the cost of a "lumper" who would help unload the truck. The dispatcher then seeks authorization for payment of this lumper. Plaintiff has not used this arrangement.

Plaintiff filed his complaint on August 11, 2006. The complaint raises two counts under the Americans with Disabilities Act (ADA). In the first count, plaintiff contends that he suffers from a disability that limits major life activities such as

bending and lifting heaving loads. He alleges that defendant refused to hire him because of his disability and refused his request to accommodate his disability. Count II alleges retaliation under the ADA. He contends that the defendant's refusal to hire him was a result of his filing an earlier lawsuit regarding disability discrimination. The complaint also contains a count of retaliation and disability discrimination under the Pennsylvania Human Relations Act (PHRA). The grounds for that count are the same as those raised under the ADA.

On November 28, 2007, the defendant filed the instant motion for summary judgment. The parties then filed briefs, bringing the case to its present posture.

**Jurisdiction**

Because this case is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et cet.*, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a) ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

**Legal Standard**

This case is before the court pursuant to defendant's motion for summary

judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986).

**Discussion**

Defendant's motion contends that plaintiff lacks evidence to demonstrate that he qualifies for protection under the ADA and that no reasonable accommodation was available for plaintiff, even if he was a qualified individual with a disability. Under the ADA, an employer cannot discriminate against a qualified individual with a disability because of her disability in regard to her employment.  42 U.S.C.A. § 12112 (a). Further, an employer must make reasonable accommodations to known physical or mental limitations of an otherwise qualified employee with a disability unless such employer can demonstrate the accommodation would impose an undue hardship on the operation of the employer's business.  Id.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (holding that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.").  Our analysis under the ADA applies equally to plaintiff's claims under the PHRA. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

The plaintiff has the initial burden in an ADA matter of establishing a *prima facie* case.  Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996); Newman v. GHS Osteopahtic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).  A *prima facie* case is established by the plaintiff when she demonstrates: 1)she is a disabled person within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the

11

employer; and 3) she has suffered an otherwise adverse employment decision as a result of discrimination. Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996); Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998).

If the plaintiff meets this initial burden, the court then applies the next step in "the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805." Abramson v. William Patterson College, 260 F.3d 265, 281 (3d Cir. 2001). The burden of production shifts to the employer to "proffer a legitimate, non-discriminatory reason for the adverse employment decision." Id. at 282. An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. (emphasis in original). Once the employer meets this burden, the plaintiff must show that a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Id. at 764.

Defendant contends that plaintiff cannot meet his initial burden in this case because he cannot demonstrate that he is a qualified individual with a disability. The ADA establishes that "[t]he term 'qualified individual with a disability' means an

12

individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The statute further defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Major life activities, left undefined by the statute, have been defined by the Equal Employment Opportunity Commission as "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing , speaking, breathing, learning, and working.'" Tice v. Centre Area Trans. Auth., 247 F.3d 506, 512 (3d Cir. 2001) (quoting 29 C.F.R. § 1630(2)(i)).

The question of "whether a person has a disability under the ADA is an individualized inquiry." Sutton v. United Air Lines, 527 U.S. 471, 483 (1999). The Third Circuit Court of Appeals has noted that "EEOC regulations provide that an individual is 'substantially limited' in performing a major life activity if the individual is (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 762 (3d Cir. 2004)

13

(quoting 29 C.F.R. § 1630.2(j)(1)).  Courts consider "[S]everal factors . . . in evaluating whether an individual is substantially limited in a major life activity: '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'"  Id. (quoting 29 C.F.R. § 1630.2(j)(2)).  In the Third Circuit, this inquiry consists of a two step process: "First, the court determines whether the individual is substantially limited in any major life activity other than working, such as walking, seeing or hearing."  Mondzlelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998).  If the individual is not limited in that way, "the court's next step is to determine whether the individual is substantially limited in the major life activity of working."  Id. at 784.

Plaintiff's complaint alleged that he suffered from "disabilities [that] affected his major life activities such as bending and lifting heavy loads."  (Complaint (Doc. 1) at ¶ 23).  The evidence indicates that plaintiff had a lifting restriction of twenty pounds when he applied for the job at PTG, and that his doctor shortly thereafter raised this limit to fifty pounds.  Plaintiff argues that this limitation does not qualify the plaintiff as disabled.  Defendant does not dispute that he would not be covered by the ADA if his limitation were lifting[2], but argues that he is disabled by virtue of his inability to sit

---

[2]Plaintiff conceded that his lifting restrictions did not qualify him as disabled during oral argument on this matter.  Case law confirms that plaintiff was correct to make this concession, since even greater lifting restrictions than plaintiff's have been found not to qualify a person as disabled.  See, e.g. Marinelli v. City of Erie, 216 F.3d 354, 364 (3d Cir. 2000) (finding that a ten-pound lifting restriction was not a substantial limitation on the

14

for long periods of time.[3]

To determine that plaintiff's restrictions on sitting constitute substantial limitations, the court must find that plaintiff is "'unable to perform a major life activity that the average person in the general population can perform' or 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under the which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in that general population can perform that same major life activity.'" Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 782-83 (3d Cir. 1998) (quoting 29 C.F.R. § 1630.2(j)(1)(i),(ii)). In short, "'[i]mpairments that result in only mild limitations are not disabilities.'" Kelly v. Drexel University, 107 (3d Cir. ) (quoting 2 EEOC COMPLIANCE MANUAL § 902 at 902-19). Here, the evidence indicates that plaintiff's hip injury

---

major life activity of lifting); Hodson v. Alpine Manor, Inc., 512 F. Supp. 2d 373, 390 (W.D. Pa. 2007) (finding that plaintiff's "claims of back pain and weight lifting restriction of 20 pounds, which make it difficult for [plaintiff] to walk, has not been held by the courts to be 'substantially limiting' in a major life activity."); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996) (finding that a ten-pound lifting restriction was not a substantial limitation).

[3]At oral argument, defendant insisted that the court could not consider "sitting" as plaintiff's claimed disability, since he had not alleged he suffered from that disability in his complaint and most likely had not raised the issue in his administrative complaint. While the court is sympathetic to defendant's argument on this point, the evidence indicates that plaintiff raised the issue of his problems with prolonged sitting during his initial job interview, bringing to that interview information about a seat he claimed was necessary to accommodate his condition. Accordingly, the court will consider whether plaintiff's claimed limitations on sitting constitute a disability in the interest of giving plaintiff a complete airing of his claims.

15

prevents him from sitting for "long periods of time" without taking an extended rest. Plaintiff contends that a different seat would give him "the ability to put in a maximum amount of hours and mileage behind the wheel before taking a break." (Dep. (Exh. 14) ¶124). He testified in his deposition that he could drive eight hours with the Talledega seat, but that without out it that "the pounding and et cetera [of driving, particularly on bad roads] is what wears you out to the point where you got to stop, take a break. You know, get out of the truck and more or less just take a break." Defendant's Exh. at 69. The court finds that this limitation of sitting is not a substantial limitation under the ADA. A limitation on the amount of time spent sitting in a truck driving over pot-wholed roads that requires a driver to stop occasionally and rest his hip or back is not uncommon in the general population and amounts only to the sort of mild limitation that does not constitute a disability. See, e.g. Horth v. General Dynamics Land Systems, Inc., 960 F. Supp. 873, 879 (M.D. Pa. 1997) (finding that the inability "to sit or stand for more than two hours at a time without having difficulty" did not constitute a substantial limitation).

Having found that plaintiff is not substantially limited in another major life activity, the court must now consider whether plaintiff is substantially limited in the major life activity of working. The evidence indicates that plaintiff, despite injuries to his knee and hip, has proved capable meeting the requirements for employment in different jobs, including the trucking job PTG denied him. "A plaintiff attempting to establish disability on the basis of 'substantial limitation' in the major life activity of

16

'working' must, at minimum, allege that he or she is 'unable to work in a broad class of jobs.'" 512 (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999)). To qualify for the limitation, such a plaintiff "must be precluded from more than one type of job, a specialized job, or a particular job choice.'" Id. (quoting Sutton, 527 U.S. at 492). Here, the evidence indicates that plaintiff found employment as a driver for two other trucking firms. The job requirements for these positions were different than those enforced by Defendant PTG; plaintiff was required to do much less unloading of trucks and maintenance of the loads on the trucks. Accordingly, plaintiff was not precluded by his injuries from working a broad class of jobs, but instead was unable to work for the particular job that was his first choice. As such, he is not substantially limited in the major life activity of working. See, e.g., Tice, 247 F.3d at 512-13 (finding that a bus driver did not have a substantial limitation on the major life activity of working even though he could not drive his bus without an accommodation because he had worked other jobs since his injury and "has not offered any evidence to suggest that his back injuries have caused him any difficulties beyond their interference with his bus driving.").

The court therefore concludes that no evidence exists that indicates that plaintiff's limitations, either on bending and lifting or in sitting, constitute a substantial limitation on a major life activity. Accordingly, the court finds that plaintiff does not qualify as disabled under the meaning of the ADA and therefore cannot make out a

17

*prima facie* case on those grounds.[4]

Plaintiff could also, however, make out a prima facie case by demonstrating that defendant "regarded him" as disabled. To do so, a plaintiff must show that "despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities." Tice, 247 F.3d at 514. Either way, "the definition of 'substantially limits' remains the same as it does in other parts of the statute." Id. at 514. The evidence here indicates that defendant concluded that plaintiff could not meet the requirements of the job because his doctor restricted plaintiff's ability to lift to fewer than twenty pounds. Plaintiff has presented some evidence that defendant's refusal to hire him was also related to his limitations on sitting without a Talledega seat. Since neither a restriction on lifting more than 20 pounds nor the limitations on sitting described by plaintiff constitute a disability, no reasonable jury could find that defendant regarded plaintiff as disabled.

**Conclusion**

The court finds that plaintiff cannot make out a prima facie case of discrimination under the Americans with Disabilities Act. He cannot show that he is an individual with a disability, that he has a record of a disability, or that his employer

---

[4]The parties do not address the issue of whether plaintiff has a record of a disability. As such, the court finds the issue has been waived.

regards him as having such a disability.  The court will therefore grant defendant summary judgment to the defendant on plaintiff's claims under that act.  Since the court has dismissed plaintiff's ADA claims,[5] the court will also dismiss his claims pursuant to the PHRA.  See, Kelly, 94 F.3d at 105.  An appropriate order follows.

---

[5] Plaintiff informed the court at oral argument that he is not pursuing his retaliation claims.

19

# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TIMOTHY J. COLEMAN,** | : | No. 3:06cv1566 |
|     **Plaintiff** | : | |
| | : | (Judge Munley) |
| **v.** | : | |
| | : | |
| **PTG LOGISTICS,** | : | |
|     **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## **MEMORANDUM**

**AND NOW**, to wit, this 17th day of September 2008, the defendant's motion for summary judgment (Doc. 17) is hereby **GRANTED**. The Clerk of Court is directed to **CLOSE** the case.

                                          **BY THE COURT:**

                                          **s/ James M. Munley**
                                          **JUDGE JAMES M. MUNLEY**
                                          **UNITED STATES DISTRICT COURT**